McCORD, Chief Judge.
These are consolidated appeals from judgments and sentences adjudicating appellants guilty of drug charges and sentencing them to prison terms. Appellants Ryder and Mitchell, who resided in Leon County, entered pleas of nolo contendere to one count of conspiracy to possess with intent to deliver and one count of conspiracy to distribute in excess of 100 pounds of cannabis in one case (Case No. 77-1258 below) and to one count of conspiracy to possess in excess of 100 pounds of cannabis in another (Case No. 77-686 below). Pursuant to a plea agreement, they reserved the right to appeal denials of their motions to suppress wiretap evidence and their motion for discharge on speedy trial grounds. We affirm.
On February 13,1977, Special Agent Layman of the Florida Department of Criminal Law Enforcement obtained from a circuit judge a wiretap order for appellant Ryder’s telephone after presenting a sworn application therefor pursuant to Chapter 934, Florida Statutes (1975). On March 10, 1977, Layman again obtained from the same circuit judge a wiretap order on the telephone listed to appellant Mitchell upon an application almost identical to the previous Ryder application. As a result of evidence obtained, either directly or indirectly from the wiretaps, appellants Ryder and Mitchell were arrested on April 18, 1977, for possession of more than five grams of marijuana and on June 22, 1977, on the conspiracy charges, the conspiracy convictions being the subject matter of this appeal.
Appellants contend that the sworn applications for the wiretap orders were insufficient in that they failed to show probable cause to believe that appellants were committing, had committed or were about to commit a particular offense enumerated in § 934.07, Florida Statutes (1975), or probable cause for belief that communications concerning such an offense would be obtained through such interception. Appel- . lants, therefore, contend the trial court erred in denying their motions to suppress. § 934.09(3)(a) and (b), Florida Statutes (1975), provides in pertinent part as follows:
“(3) Upon such application, the judge may enter an ex parte order, as requested or as modified, authorizing or approving interception or wire or oral communications within the territorial jurisdiction of the court in which the judge is sitting if the judge determines on the basis of the facts submitted by the applicant that:
(a) There is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in s. 934.07;
(b) There is probable cause for belief that particular communications concerning that offense will be obtained through such interception.”
Appellants contend that the sworn application for wiretap serves the same function as an affidavit for a search warrant, and that the judicial doctrines developed in the search warrant area apply when examining the sufficiency of a wiretap application. We agree generally with that contention, and the state has not contended otherwise.
The sworn application is a 24 legal page document which sets, forth a detailed account of widespread drug operations of appellants and others, part of which was related to the affiant, Layman, by two confidential informants. The application also relates the results of the execution of a subpoena duces tecum of safety deposit box records of Ryder’s safety deposit box leased *1068 from the Ellis National Bank. It further relates information obtained from telephone toll records obtained upon execution of subpoenas duces tecum of appellants’ telephones as well as the telephones of a number of other individuals alleged to have been involved in the illegal drug operation. In addition, it sets forth statements of affi-ant corroborating through investigation some of the information furnished to affi-ant by the confidential informants.
Appellants contend that the application is insufficient in that it does not state the time when the confidential informants observed the illegal activity. They contend further that there was not a full and complete statement of the necessary facts and circumstances to support the issuance of the wiretap order, as required by § 934.09, in that it does not relate when in point of time the confidential informants observed the illegal activity and does not indicate how the informants were in a position to obtain the information they passed on to Layman, They further contend that there was no probable cause to issue the wiretap order because the applicant’s information was fatally “stale”; that, in addition, tips supplied by the informants were insufficient to establish probable cause under the constitutional requirements of Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).
Here we have different circumstances than were present in the various authorities relied upon by appellants. In those cases search warrants were held invalid because the affidavits in support of them rested solely on unreliable information. Had Layman’s application for search warrant been, based upon nothing more than the information received from his confidential sources, appellants’ authorities would be applicable, and the wiretap order could not have been legally granted. Likewise, had Layman’s information in support of the order consisted of nothing more than his observation of bank records or of telephone records, the order could not have been issued. When, however, we examine the affidavit as a whole, it leads to the inescapable conclusion that there was probable cause for the judge issuing the orders to believe that appellants were dealing in narcotic or other dangerous drugs in violation of the laws of this state.
Layman revealed that his informant (whom we will refer to as Source No. 1) told him that appellant Ryder was a large-scale marijuana and cocaine dealer. The source provided information about Ryder’s home, his phone number and his vehicle. The source stated that Ryder got his marijuana from Tom Strang in Ft. Lauderdale in 75 to 100 pound loads; that it was broken up for distribution at appellant Mitchell’s house in the Miccosukee Land Co-Op. Mitchell was described and was alleged to have been a close associate of Ryder who himself bought marijuana from Tom Strang. Source No. 1 said that sometimes Mitchell and Ryder worked together and sometimes they worked independently. It was stated that Ryder purchased cocaine from David Polan-sky, a resident of Sacramento, California, and a drug counselor; that Polansky dates Ryder’s sister who lives in California and her phone number was provided; that Ryder gets cocaine from Polansky and stores it in a safety deposit box at the Ellis National Bank; that cocaine is only removed from the safety deposit box when a sale is arranged. Source No. 1 gave Layman background information on Tom Strang and also gave names of people who purchased marijuana from Ryder. In most instances the addresses and phone numbers of those purchasers were provided. Source No. 1 also provided Layman with a code which he stated the principals used.
The second confidential informant (whom we will refer to as Source No. 2) told Layman that he knew Ryder, Tom Strang and others. He claimed to have purchased marijuana from Strang in amounts up to 100 pounds. [This would appear to be an admission against penal interest by Source No. 2. See Baker v. State, 336 So.2d 364 (Fla.1976).] Source No. 2 corroborated Source No. l’s information that Strang is the Ft. Lauderdale supplier. He revealed essentially how Strang obtains his drugs and stated that he had spent days at *1069 Strang’s house in Ft. Lauderdale and had personally seen Ryder purchase marijuana from Strang two times in one day.
Layman, through his further investigation following directions given to him by Source No. 1, went to Ryder’s residence and observed a vehicle fitting the description of that described by the source. Subsequently, Layman observed another vehicle parked at Ryder’s residence which he learned belonged to Mitchell. Other fellow agents of the Florida Department of Criminal Law Enforcement had seen Mitchell’s truck at Ryder’s residence. Further investigation by Layman revealed that Ryder and Mitchell had a safety deposit box in the Ellis National Bank as related in the affidavit. Records of the box revealed that from the period beginning February 17, 1975, and ending September 15, 1976, numerous entries into the box occurred. [While standing alone this is insignificant, it does establish that Ryder maintained a safety deposit box where Source No. 1 said he did and establishes a frequency of visits for apparently short times which tends to corroborate the information given by Source No. 1 that the cocaine stays in the box until a sale is arranged.] The records revealed that no activity with the box occurred between the date of the last log entry and January 21, 1977. On the latter date, however, Ryder was observed by two of Layman’s fellow agents to enter the bank at 4:26 p. m. and exit at 4:33 p. m. carrying an envelope. These agents at that point began surveillance of Ryder, but the surveillance was defeated by evasive tactics of Ryder in the vicinity of Buckingham and Las Palmas Apartments. [It is somewhat coincidental that other evidence of the Federal Drug Enforcement Administration, as related in the affidavit, identified those apartments as the residence of several cocaine dealers.]
The affidavit further reveals that officers of the Tallahassee Police Department and agents of the Federal Drug Administration surveilled a residence on Raymond Diehl Road for the purpose of arresting one Glen Arden Dugan. Dugan lived in the same duplex as Gary Albert Jennings. Raymond Diehl Road was given by Source No. 1 as Jennings’ residence. The officer .observed a vehicle leave the duplex and stopped it later at Interstate 10. At that time, Timothy Allen and Rubin Patrick were arrested for possession of marijuana. Patrick and Allen gave a statement to the effect that Patrick purchased a quarter pound of marijuana from Jennings for.$105 and that there was more marijuana in a green plastic bag in the bedroom. A search warrant was obtained and executed at the Jennings’ residence whereupon 25 pounds of marijuana and other narcotics were found and Jennings and his wife were arrested. Ryder’s telephone number was found to be in Jennings’ address book, and Ryder was instrumental in seeing that Mr. and Mrs. Jennings were bonded out of jail.
Another subpoena duces tecum for the records of the telephone numbers listed in the affidavit was issued and served. Among those numbers were the numbers of Ryder and Mitchell. The subpoena covered a period beginning when the phones were installed and ending November 19,1976. A review of those records revealed that the Friends In-Deed Center in Sacramento, California, area was called from Ryder’s number 15 times. The affidavit stated that California authorities revealed that the center is a halfway house employing counselors who are ex-drug offender’s, several of whom have drug records. Calls were made from Ryder’s number to another number in California and investigation revealed that such number was that of Ryder’s sister who, according to Source No. 1, dated David Po-lansky, the alleged supplier of cocaine to Ryder. The number Source No. 1 gave to Layman is identical to that revealed in the telephone logs.
The telephone records further show that calls were placed from Ryder’s number to a number subscribed to by the father of Tom Strang. Also, numerous calls from Ryder’s number were placed to a particular phone in Ft. Lauderdale. At the address of that phone, fellow agents of Layman observed a truck registered to William Raabe, a name given to Layman by Source No. 2. A check of rental records of that truck provided a *1070 connection between Raabe and Richard Strang, brother of Tom Strang. There were other calls from Ryder’s number to a Ft. Lauderdale address and calls to William Stuart Benners, a name previously supplied • by Source No. 1. The telephone log also revealed that several calls were made from Ryder’s telephone to a telephone company test number in Capital Heights, Maryland. The affidavit relates that Maryland police stated that telephone security officers advised that members of the criminal element mistakenly believe they can call telephone company test numbers and determine from the tone heard whether or not their telephone is tapped.
Calls coming from the telephone number registered to appellant Mitchell showed that he called Richard Strang, brother of Tom Strang. The balance of the telephone logs show calls between most of the people who were named by the confidential sources as drug dealers.
While the individual pieces of information received from various sources, when isolated, are each in themselves insufficient to show probable cause, when assembled and considered in relation to each other and in relation to the information obtained from the telephone records together with the corroboration of ' some of the statements through investigation, we find that they fit together like a jigsaw puzzle and clearly reveal probable cause for belief that appellants were engaged in a conspiracy to violate the drug laws through use of their telephones.
As to appellants’ contention that the information related to Agent Layman was stale and, therefore, could provide no predicate for issuance of the wiretap order, there are authorities, as pointed out by appellants, which set up deadlines of a certain number of days after which the information will be too stale upon which to predicate a search warrant. Those cases, however, deal with particular situations in which the affidavit for search warrant is predicated only upon such information. One such case in Hamelmann v. State, 113 So.2d 394 (Fla. 1 DCA 1959). That case involved an affidavit for search warrant made six months after the occurrence of the incident related in the affidavit which stated that (quoting from the opinion):
“. . affiant entered a certain described building occupied by defendant and others in which he observed stated activities indicating that defendant was engaged in the operation of a house of ill fame.”
The court found there was an unreasonable lapse of time between the date on which affiant allegedly observed the offense and the date on which he executed his affidavit in support of the search warrant and that, therefore, no probable cause existed that the defendant was engaged in a violation of the laws of the state at the time of the execution of the affidavit. Unlike the case sub judice, the affidavit there related only the one single incident on which the warrant was predicated. The opinion in Ha-melmann acknowledges that there is no strict rule as to the permissible number of days which may elapse between the date of the observed offense and the making of the affidavit upon which the search warrant is based. The court there pointed out that the nearer the time is at which the observation was made to the time when the affidavit is or was executed, the more probable it is that a conclusion of probable cause may be justified. We do not disagree with that premise, but the affidavit in the case sub judice rests upon a great deal more than a single isolated incident.
Appellants contend that the information received from Source No. 1 was 100 days old, and that received from Source No. 2 was 30 days old. This, however, is not a valid representation since Layman swore that he met Source No. 1 at a November 10, 1976, meeting and on several succeeding meetings and, as a result of all those meetings, the information he recited was obtained. November 10 is meaningless since it-only reflects the first time Layman met with Source No. 1. The same is true for Source No. 2 since once again Layman stated that he met with Source No. 2 on January 19, 1977, and on other occasions.
Appellants place reliance upon Rodriguez v. State, 297 So.2d 15 (Fla.1974). While the *1071 Supreme Court found there that the affidavit was insufficient due principally to staleness of the incident relied upon to establish probable cause, it made the following statement which supports the affidavit in the case sub judice:
“As the State has ably pointed out in its brief, the sufficiency of an affidavit to establish the necessary elements to support issuance of a wiretap order must be determined from a reading of the affidavit as a whole, not from bits and pieces read in isolation.”
The court went on to further say:
“. . . the issue of ‘staleness’ cannot be solved by a simple application of numbers of days without consideration of the overall particular circumstances presented by the case.”
The court further pointed out that the nature of the illegal activity has a bearing upon the question of timeliness of the affidavit and stated:
“For example, an affidavit dealing with the offense of possession of marijuana in quantity less than five grams (F.S. § 893.-13, F.S.A.) will become ‘stale’ quickly (in view of the possibility that the alleged offender will either dispose of this quantity quickly or consume it himself), whereas an affidavit dealing with the offense of embezzlement may (depending on the particular circumstances involved) remain timely for a longer period. Although some matters listed in the instant affidavit may give rise to a suspicion that a large and continuous gambling operation existed, the totality of the facts set forth in this affidavit are not sufficient to establish probable cause to believe that the offense was being committed or about to be committed at the time of the affidavit.”
In the case sub judice, the affidavit clearly showed probable cause to believe that appellants were carrying on a continuing large-scale and widespread illegal operation in conspiracy to violate the jjarcotic and dangerous drug laws. It is not likely that such an operation as that shown in the affidavit would suddenly terminate short of arrest or fear of arrest of the participants.
In Aguilar v. Texas, supra, the United States Supreme Court reviewed an affidavit for a warrant to search for narcotics in petitioner’s home. The court quoted the relevant part of the affidavit as follows:
“ ‘Affiants have received reliable information from a credible person and do believe that heroin, marijuana, barbiturates and other narcotics and narcotic paraphernalia are being kept at the above described premises for the purpose of sale and use contrary to the provisions of the law.”
The court held this affidavit insufficient stating:
“Here the ‘mere conclusion’ that petitioner possessed narcotics was not even that of the affiant himself; it was that of an unidentified informant. The affidavit here not only ‘contains no affirmative allegation that the affiant spoke with personal knowledge of the matters contained therein,’ it does not even contain an ‘affirmative allegation’ that the affi-ant’s unidentified source ‘spoke with personal knowledge.’ ”
The court pointed out that for all that appears from the affidavit, the source merely suspected, believed or concluded that there were narcotics in petitioner’s possession; that the magistrate certainly could not judge for himself the persuasiveness of the facts relied upon to show probable cause; that he necessarily accepted without question the informant’s suspicion, belief, or mere conclusion.
Aguilar and the subsequent opinion •of the U.S. Supreme Court in Spinelli v. U. S., supra, stand for the proposition that (1) an affidavit for search warrant must set forth sufficient underlying circumstances to enable the magistrate independently to judge the validity of the informant’s conclusion that the contraband was where he said it was, and (2) the affidavit must contain support for-the reliability of the confidential informer other than a mere statement by the affiant officer that the informant is reliable. The court, in Spinelli, said:
“In the absence of a statement detailing the manner in which the information was gathered, it is especially important that *1072 the tip describe the accused’s criminal activity in sufficient detail that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an ■accusation based merely on an individual’s general reputation.”
The court further said:
“. . . we do not retreat from the established propositions that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause, . . . ; that affidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial . . . ; that in judging probable cause issuing magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense . . . ; and that their determination of probable cause should be paid great deference by reviewing courts
While the affidavits in Aguilar and Spinelli ' did not meet the tests outlined by the court, the detail provided by the informants in the case sub judice when considered in conjunction with the corroboration of some elements by investigative officers and the telephone toll records of the numerous persons involved in the illegal activity, do meet the tests. This is particularly true when we examine its entirety without being confined by niggardly limitations or restrictions on the use of common sense.
In addition to the foregoing, appellants contend that postponement of serving of inventories upon them by the state was invalid and should have resulted in an order suppressing the evidence. § 934.09(7)(e), Florida Statutes (1975), provides:
“Within a reasonable time but not later than 90 days after the termination of the period of an order or extension thereof, the issuing or denying judge shall cause to be served on the persons named in the order or the application, and such other parties to intercepted communications as the judge may determine in his discretion that is in the interest of justice, an inventory ...”
Appellant’s contention is that because the application for extension was authorized by an assistant state attorney rather than the state attorney, it is invalid. This contention of appellants is without merit. § 934.-07, Florida Statutes (1975), provides that any state attorney may authorize an application to a judge of competent jurisdiction for an order authorizing interception of wire communications by the Department of Criminal Law Enforcement. § 27.181(3), Florida Statutes (1975), gives the assistant all the powers of the state attorney. See State v. Angel, 261 So.2d 198 (Fla. 3 DCA 1972), aff’d. 270 So.2d 715.
Finally, appellants contend that the trial court erred in denying in Case No. 77-1258 below their motion for discharge filed under Fla.R.Crim.P. 3.191(a)(1) — the speedy trial rule. They contend that since more than 180 days had elapsed between the date they were first arrested (April 18, 1977) and the date they filed their motion for discharge (December 8, 1977), Case No. 77-1258 below should have been dismissed.
At the time of appellant’s first arrest (April 18, 1977), the intercept was on their telephones, and the state agents were in the process of investigating their operations along with the operations of numerous other persons involved .in the above-mentioned criminal episodes. At that time, the investigators learned that Mitchell and Ryder had approximately 130 pounds of marijuana in their possession. They then obtained and executed a search warrant for the purpose of seizing that marijuana and arresting appellants on the possession charge. Upon execution of the warrant, approximately 99 pounds of marijuana was seized, and appellants were arrested for possession in excess of five grams of marijuana as aforesaid. (This is not one of the cases here on appeal.) The evidence shows that this happened in the middle of the state’s conspiracy investigation at a time when the state had insufficient evidence to make conspiracy arrests. The overall investigation continued thereafter. While they could now be classed as a part of the overall criminal conspiracy, the initial possession arrests of April 18 were a separate criminal episode that formed only *1073 a minor link in the overall conspiracy which was charged later after sufficient evidence of conspiracy had been obtained. Upon completion of the conspiracy investigation, appellants and others were arrested on the conspiracy charges on June 22, 1977. It is from the judgments and sentences on these June 22 conspiracy charges that this appeal was taken. These arrests were primarily based upon a conspiracy to possess and distribute a 50-ton load of marijuana received by Tom Strang subsequent to the April 18 possession charges. Appellants’ motion for discharge was filed and heard within 180 days of their arrest on the charges in Case No." 77-1258. The trial court correctly denied the motion.
Petition for rehearing, if filed, shall be filed within 10 days from the date hereof.
AFFIRMED.
BOYER and MILLS, JJ., concur.